**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JUDITH F. VOLLMAR** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SPS TECHNOLOGIES, LLC,** | : | **No. 15-2087** |
| *Defendant*. | : | |

# M E M O R A N D U M

PRATTER, J.                                                         DECEMBER 2, 2016

      Judith Vollmar, a female employee of the defendant SPS Technologies, LLC, initiated this sex discrimination, retaliation, and harassment action against her employer pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951 *et seq.* ("PHRA"). The upshot of her suit is that her workplace environs were inhospitable due to the ever-present sexual overtones of materials kept in the place where she worked and the nature of her treatment by colleagues.

      SPS moved for summary judgment as to all of Ms. Vollmar's claims. Ms. Vollmar, in addition to arguing that issues of material fact preclude the Court from granting SPS's motion for summary judgment, has filed her own motion for partial summary judgment as to the *respondeat superior* liability element of her *prima facie* hostile work environment claim. The Court finds that there are genuine issues of material fact as to all of Ms. Vollmar's claims and will therefore deny SPS's summary judgment motion. The Court will also deny Ms. Vollmar's motion for partial summary judgment.

1

## I.    Factual Background

Ms. Vollmar is currently an employee of the defendant, SPS, which manufactures performance fasteners.  The majority of SPS's employees work in manual labor jobs.  Men comprise over 90% of the workforce at Ms. Vollmar's work location.  Evidence on the record shows that the SPS location where Ms. Vollmar works contained non-employment related materials that were gender-based or of a sexual nature. These materials included: (1) a flip sign that sat on a refrigerator that included phrases such as "My sexual preference is . . . often" and "I am not a bitch. I've just been in a very, very bad mood . . . for the past 30 years;" (2) photographs of women, one with the word "PIG" written across it; (3) a small box containing four small plastic or candy breasts, where the lid read "Bet you can't eat just one;" (4) a Penthouse pornographic magazine; and (5) a "pick out" box of bolts with a note on the bolts that states "Points are not flat (tit)."

Ms. Vollmar alleges that SPS coworkers and managers regularly directed sexist comments toward her.  She testified that she had been called a "bitch" several times a week.  She also testified that she had been told that "It's just like a woman to do that," and was regularly told that she did not know what she was talking about because she was a woman.  She alleges generally that employees made sexist comments on a daily basis and throughout her tenure at SPS.

Ms. Vollmar has worked for SPS in some capacity since 1989 and has been at the Jenkintown facility since 1994.  Beginning in 2008, Ms. Vollmar served as a machine operator on the first shift and reported to Robert Costello.  In July 2013, Ms. Vollmar asked Mr. Costello to be allowed to move from the first shift to the third shift.  Ms. Vollmar alleges that the move

2

was an attempt to avoid another coworker, Kurt Steiss, who had a habit of staring at her during work hours.

Mr. Steiss is 6'6" tall and weighs 285 pounds[1] and had a habit of staring at male and female coworkers.  Ms. Vollmar testified that Mr. Steiss's staring could last up to fifteen minutes.  She characterized the way he stared at her as "sexual," where he would leer at her, or he would take a "softer" approach by pretending to work while looking at her.  Alternately, Ms. Vollmar alleged that his staring could be "aggressive," where he would square his shoulders, presumably adopting a more defiant posture.  She alleges that she had complained about Mr. Steiss staring as early as 2009.

At the time of Ms. Vollmar's request to move to the third shift, the third shift supervisor was Mark Giovinazzo.  Mr. Giovinazzo and Ms. Vollmar had been engaged in an "on again, off again" romantic relationship since 2007, which was known throughout the Jenkintown SPS facility.  Following her request for a move, Ms. Vollmar began working in the third shift. Around the end of July, Ms. Vollmar and Mr. Giovinazzo began seeing each other again.

In mid-August 2013, shortly after Ms. Vollmar's move to the third shift, SPS's Human Resources department began an investigation into whether Ms. Vollmar working on the third shift with Mr. Giovianzzo violated a provision of the company's Code of Conduct prohibiting conflicts of interest.  At an August 15 meeting with Mr. Costello and Blake Ray, Director of Operations, Ms. Vollmar denied that her relationship violated the SPS Code and stated that she and Mr. Giovinazzo "were close friends."  She also argued that other employees who had violated the policy were not investigated, and she raised concerns that Kurt Steiss stared at her during work.  At an August 19 meeting with Mr. Ray and then-Human Resources Director Bridget Drelling, Ms. Vollmar again denied being in a romantic relationship with Mr.

---

[1] Ms. Vollmar is 5'3" tall.

3

Giovinazzo and complained about Mr. Steiss's staring.  Once again, she complained of previous instances of harassment, untoward comments made to her, and disparate treatment.

Following the August 19 meeting, Mr. Ray and personnel in the Human Resources department were concerned that Ms. Vollmar and Mr. Giovianzzo were not cooperating with the investigation, which itself could result in a separate violation of the Code of Conduct.  On August 26, after the company discovered that Mr. Giovianzzo had listed Ms. Vollmar as his emergency contact and life insurance beneficiary, both employees were suspended pending the outcome of the investigation.  At the time of Ms. Vollmar's suspension, SPS had not yet decided whether she had violated the Code.  On September 6, both Mr. Giovinazzo and Ms. Vollmar received written communications to the effect that their conduct violated SPS's Code of Conduct.

Mr. Giovinazzo was terminated for violating the Code.  Ms. Vollmar received Final Written Warning for a violation of the Code, but returned to work after a 10-day suspension.  Ms. Vollmar's suspension was initially without pay, but she was later awarded back pay for this time.  She alleges that she was not compensated for the overtime she would have otherwise received if she had been working during the suspension period.

Ms. Vollmar alleges that she sought therapy following incident.  She continues to treat with a therapist.  On September 11, 2013, Ms. Vollmar retained counsel.  Shortly thereafter, she filed a sex discrimination charge with the Equal Employment Opportunity Commission, which was dual-filed with the Pennsylvania Human Relations Commission.  The EEOC issued its Notice of Right to Sue on January 23, 2015, and the filing of Ms. Vollmar's complaint in this Court timely followed.

II.    **Standard of Review**[2]

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).  A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden may be met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.  Summary judgment is proper if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

III.    **Discussion**

A.  **Hostile Work Environment**

---

[2] This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

SPS argues that it is entitled to summary judgment as to Ms. Vollmar's hostile work environment claim.  To establish a *prima facie* hostile work environment claim under Title VII and the PHRA,[3] a plaintiff must show:

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.

*Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  The Supreme Court has directed courts  "to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

SPS argues that the record does not establish the last four elements of the *prima facie* case:  (1) that the conduct alleged was sufficiently severe or persuasive; (2) that the conduct detrimentally affected the plaintiff; (3) that the conduct would have detrimentally affected a reasonable person in the plaintiff's position; (4) and the existence of *respondeat superior*.  Ms. Vollmar contends that a genuine issue of material fact exists as to the first three elements and filed a motion for partial summary judgment urging that she is entitled to judgment as a matter of law as to the existence of *respondeat superior*.  The Court concludes that genuine issues of material fact preclude summary judgment as to Ms. Vollmar's hostile work environment claim

---

[3] The protections of the PHRA replicate those provided by Title VII, so the two claims are analyzed together. *See Weston v. Pennsylvania*, 251 F.3d 420, 425 n. 3 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("The proper analysis under Title VII and the [PHRA] is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.").

and declines to find, as a matter of law, that Ms. Vollmar has met the element of *respondeat superior*.

### 1. Severe or Pervasive

Ms. Vollmar has demonstrated a genuine issue of material fact regarding whether the alleged discrimination was severe or pervasive. To meet this factor, there is no quantitative formula to use, but rather, a plaintiff must show that her workplace was "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 20. Workplace conduct may be severe, pervasive, or both: "a single incident of severe harassment in the workplace may contaminate the work place to such a high degree that it will be considered hostile. Where harassment is not severe, incidents of harassment must occur either in concert or with regularity." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 428 (E.D. Pa. 2010) (internal citations omitted). Notably, "the severity and pervasiveness evaluation is particularly unsuited for summary judgement [sic] because it is 'quintessentially a question of fact.'" *Id.* at 429 (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

Ms. Vollmar contends that a fact-finder could conclude that the alleged discrimination was severe and pervasive because SPS created a culture of sexism riddled with sexist language, degrading signs, and sexually explicit images.[4] The Third Circuit Court of Appeals has

---

[4] SPS argues that any incident prior to December 8, 2012—300 days prior to the date Ms. Vollmar filed her EEOC charge—is untimely and may not be considered. Discriminatory acts before the 300-day period may be considered, however, under a "continuing violation" theory, which SPS acknowledges. "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (internal quotation marks omitted). To demonstrate a continuing violation, a "plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period. *Id.* at 165–66. Ms. Vollmar has alleged that at least one act occurred within the statute of limitations period—Mr. Steiss's staring—and all conduct relates to alleged sex discrimination at SPS. Consequently, comments falling outside the 300 day mark are not barred in this case.

expressly held that both "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally" and "the posting of pornographic pictures in common areas and in the plaintiffs' personal work spaces" may serve as evidence of a hostile environment. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990). Here, there is evidence on the record of both.

Ms. Vollmar points to evidence in the record to the effect that coworkers frequently called her a "bitch" in the workplace, she was told she was not able to do certain jobs because she was a woman and made less money because she was a woman, and male coworkers made lewd comments about her body.[5]  Specifically, Ms. Vollmar (who reportedly has red hair) was asked by coworkers if she was a firecracker in bed and if the "carpet" matched the "drapes," in apparent reference to her pubic hair.  She alleges that on another occasion, an employee acted out by "humping" a door while professing love for her.  She also testified that Mr. Steiss, who is physically intimidating, stared at her in a sexual and aggressive manner.

In addition to such alleged comments and behavior by other SPS employees, evidence in the record suggests that SPS's Jenkintown facility contained a variety of sexually explicit and gender-based material.  A flip sign displayed on a refrigerator at SPS included cards that read "I am not a bitch. I've just been in a very, very bad mood . . . for the past 30 years" and "my sexual preference is . . . often."  Pl. SOF ¶ 29.  Roger Getz, a team leader tasked with performing monthly sweeps of the workplace to look for inappropriate material and behavior, testified that he thought the flip sign could violate SPS's Sexual Harassment Policy.  He did not remove the

---

[5] SPS argues in its Reply that the Court should disregard Ms. Vollmar's uncorroborated testimony and affidavit. The question is not, however, "whether Plaintiff has relied solely on h[er] own testimony to challenge the Motion[], but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature." *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012). The Court concludes that a rational factfinder could credit Ms. Vollmar's testimony in light of the evidence put forth by SPS.

sign because "it wasn't important to [him]."  Pl. SOF ¶ 32.  Mr. Costello also testified that the signs are potentially offensive to women.  Also on a SPS refrigerator door was a suggestive picture of a celebrity, Miley Cyrus, with the word "PIG" written across her body.  Mr. Getz testified that he thought the picture was inappropriate and that it could violate the sexual harassment policy, but he did not think to remove it during his monthly sweeps of the facility.

There is also evidence on the record of additional graphic materials in the SPS workplace.  In January 2014, Ms. Vollmar found a small box containing miniature toy breasts that urged "bet you can't eat just one."  In April 2014, Ms. Vollmar found a Penthouse pornographic magazine. Ms. Vollmar points out that Human Resources representatives at SPS acknowledged that bringing the toy breasts or a pornographic magazine into the workplace would violate SPS's Sexual Harassment policies.[6]

SPS does not argue that these events did not occur, but rather that these events were isolated and did amount to a pattern of conduct necessary to show the "severe or pervasive" prong of a hostile work environment claim.  Viewing the evidence in the light most favorable to Ms. Vollmar, however, and considering the frequency and variety of the types of gender-based and sexual language, material, and conduct, the Court concludes that a jury could determine that the harassment was severe or pervasive.

### 2.  Did the Discrimination Detrimentally Affect Plaintiff

Ms. Vollmar has also put forth evidence that the environment at SPS detrimentally affected her.  If a plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  *Harris*, 510 U.S. at 21–22.  Once again, no single factor is required, but "[t]he

---

[6] Ms. Vollmar notes that Kathryn Martin, the Senior Human Resources Director, testified that she "actually thought [the Penthouse magazine] was intended to be art" and that "[i]t wasn't hardcore porn.  It was bondage photography by someone in Europe where this is certainly more common."  Pl. SOF ¶ 147.

effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.* at 22.

SPS alleges there is no evidence of a detrimental effect on Ms. Vollmar as a result of the alleged harassing environment. SPS contends that Ms. Vollmar only reported Mr. Steiss's staring, the box of toy or candy breasts, and the magazine. SPS advances the notion that she could not have been detrimentally affected by additional alleged harassment if she did not complain about the conduct.

The extent to which Ms. Vollmar complained about the specific events or the work environment at SPS is disputed. In addition to Ms. Vollmar's own testimony that she suffered emotional distress as a result of the harassment,[7] the record indicates that she sought and continues to seek therapy, that she moved her shift to avoid Mr. Steiss, and that she repeatedly complained to the Human Resources department and her supervisors. Consequently, Ms. Vollmar has provided enough evidence for a jury to conclude that she was detrimentally affected by the environment at SPS.

### 3.   Would the Discrimination Detrimentally Affect a Reasonable Person of the Same Sex, In the Same Position

Ms. Vollmar has also shown a genuine issue of material fact as to whether a reasonable person of the same sex in the same position would have been detrimentally affected by the harassment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. So, a plaintiff must show that

---

[7] SPS argues that, as a matter of law, a plaintiff cannot recover for emotional distress absent "competent medical evidence" and cites to two cases that address emotional distress as a tort rather than the analysis necessary to establish establishing distress as an element of a Title VII claim. *See Robinson v. May Dep't Stores Co.*, 246 F. Supp. 2d 440, 443 (E.D. Pa. 2003) (setting out elements for torts of intentional and negligent infliction of emotional distress under Pennsylvania law); *Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 190, 527 A.2d 988, 991 (Pa. 1987) (same). Ms. Vollmar did not allege a common law tort claim, and she is not here required to prove the elements of one.

"a reasonable person in the plaintiff's position, considering all of the circumstances," would be detrimentally affected. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks omitted). Considering social context "enable[s] courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* at 82.

At least twice in its briefing, SPS engages in stereotyping and notes that the machine shop where Ms. Vollmar works is a "blue collar" workplace, as though that dismissive description should serve as a panacea "pass" for sexist or offensive conduct in the workplace. *See* Def. Br at 2 ("SPS is a machine shop, a blue collar workplace"); Def. Br at 44 ("SPS is a machine shop, a blue collar workplace"). SPS further attempts to justify the events and conduct at issue by implying that Ms. Vollmar was a willing participant because she attempted to hold her own by relying on the vernacular of the environment and stating that she was fully capable of telling her coworkers to "get away from her when it suits her." Def. Br at 44. SPS cites case law indicating that in environments where foul language or joking among coworkers is commonplace, it becomes more challenging for a plaintiff to show a hostile work environment claim. *See, e.g.*, *Medvic v. Compass Sign Co.*, No. 10-5222, 2011 WL 3513499, at *11 (E.D. Pa. Aug. 10, 2011); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). However, unlike cases where the questionable conduct was rampant and indiscriminate among all employees, Ms. Vollmar was one of only a few female employees subject to questionable comments, behavior, and materials in a male-dominated workplace. That a particular workplace is considered "blue collar"—whatever that is

supposed to mean—does not absolve an employer of fostering a workplace hostile for female employees.  The United States Court of Appeals for the Sixth Circuit observed:

> We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment. Surely women working in the trades do not deserve less protection from the law than women working in a courthouse.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999); *see also Flick v. Aurora Equip. Co.*, No. CIV.A. 03-CV-2508, 2004 WL 220859, at *6 (E.D. Pa. Jan. 13, 2004) (holding that the combination of sex-specific derogatory terms such as "fucking bitch" and "regular instances of hostility directed at Plaintiff by her co-workers creates an inference of a hostile work environment sufficient to survive summary judgment").  Here, evidence on the record indicates that the SPS workplace contained sexually explicit materials and Ms. Vollmar was subjected to intimidating staring, name calling, and derogatory comments about her gender.  Given these facts, a jury should be permitted to decide whether a reasonable person in the plaintiff's position would have been detrimentally affected.

#### 4.  *Respondeat Superior* Liability

Genuine disputes of material facts exist as to whether Ms. Vollmar has established *respondeat superior* liability.  Employer liability may turn on whether the harasser is the plaintiff's coworker or supervisor.  In either case, given the record in this matter, a jury should decide.

The bulk of Ms. Vollmar's harassment allegations pertain to conduct by coworkers, or non-supervisors. To show *respondeat superior* liability for nonsupervisory harassment, a plaintiff must establish three elements: (1) management level employees (2) had actual or

constructive knowledge of the harassment and (3) failed to take prompt and appropriate remedial action. *See Huston*, 568 F.3d at 104; *see also Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (noting that an employer will be liable for nonsupervisory harassment if the employer is shown to be "negligent or reckless in failing to train, discipline, fire, or take remedial action upon notice of the harassment").

Ms. Vollmar alleges that SPS's management level employees had actual or constructive knowledge of the harassment that was being perpetrated by her coworkers (nonsupervisory employees) and did nothing to halt or curtail it. She alleges that Mr. Getz, Ms. Drelling, Ms. Keenan, and Ms. Martin, who she argues are management level employees, were aware of the alleged harassment. SPS responds that Mr. Getz is not was not a management level employee for purposes of Title VII, and those that were responded appropriately.

The Third Circuit has stated that, in determining whether an employee is management level, one should rely on general agency principles:

> [K]nowledge of allegations of co-worker sexual harassment may typically be imputed to the employer . . . where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties.

*Huston*, 568 F.3d at 107. This approach is consistent with the ordinary meaning of the term "management." In *Huston*, upon which both parties rely, the Court of Appeals observed that the employees in question were not management level because "although they happened to perform some oversight functions as process coach and machine leader, respectively, they remained technicians, generally practicing the same skills and often performing substantially the same functions as the other members on [the plaintiff's] work team." *Id.* at 108. In that case,

they were not salaried employees assigned the tasks of disciplining employees or responding to complaints—their supervisory roles were limited to keeping the machines working.

Evidence in the record suggests that Ms. Getz may be a management level employee. Mr. Getz was a "team leader."  Although SPS contends that a "team leader" is not management level, Mr. Getz testified that he was unable to participate in a union vote because he was considered management.  Mr. Getz was also authorized to issue verbal warnings to subordinate SPS employees and patrolled the workplace through regular sweeps looking for inappropriate materials.  While *Huston* may be factually similar to this case in certain respects, Ms. Vollmar has created a dispute of material fact regarding whether Mr. Getz was management level for purposes of establishing her *prima facie* case.

SPS also argues that when its management level employees became aware of the allegations, they responded reasonably.  SPS points to evidence that Mr. Steiss was spoken to about the alleged staring, and that the pornographic magazine was removed.  Nevertheless, Mr. Getz and Mr. Costello's testimony indicates that they were aware of materials that admittedly could be offensive to female employees and could violate SPS's sexual harassment policy. Consequently, genuine disputes of material fact exist with regard to nonsupervisory harassment.

The bulk of Ms. Vollmar's allegations center on harassment by nonsupervisory employees.  Ms. Vollmar alleges, however, that Mr. Getz—who is debatably a management level employee—made sexist comments to her and declined to remove signage that, as he himself testified, could be offensive to women.  Out of an abundance of caution, SPS raises a *Faragher-Ellerth* affirmative defense, which applies only to such supervisory harassment.[8]  Should this

---

[8] Unlike nonsupervisory harassment, employers are *per se* liable for harassment by supervisors with authority over the victim.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").  An employer can avoid liability for supervisory

defense apply,[9] the record contains disputed facts regarding the extent to which Ms. Vollmar reported the alleged harassing behavior and the degree to which SPS responded. Consequently, the *Faragher-Ellerth* defense is an inappropriate foundation on which to base summary judgment.

For the foregoing reasons, the record precludes summary judgment for SPS on Ms. Vollmar's hostile work environment claim. Likewise, the record precludes summary judgment for Ms. Vollmar with respect to the *respondeat superior* element of her hostile work environment claim.

### B. Retaliation Claim[10]

When evaluating retaliation claims under Title VII and the PHRA, courts apply the familiar three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case for retaliation. *Id.* at 802. If a plaintiff establishes the *prima facie* case, the burden then

---

harassing conduct by asserting a *Faragher-Ellerth* affirmative defense, if no tangible employment action has been taken against a subordinate employee, if the employer demonstrates:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 745. SPS asserts the *Faragher-Ellerth* defense and alleges that Ms. Vollmar failed to timely report the alleged harassment, did not report the harassment to management level employees, and to the extent any supervisory employees were aware of the harassment, appropriate action was taken. Ultimately, whether Ms. Vollmar took advantage of proper reporting avenues and the appropriateness of SPS's response is a jury question.

[9] Ms. Vollmar contends that SPS may not raise the *Faragher-Ellerth* defense in its motion for summary judgment because it had not included it in its answer. SPS argues that the affirmative defense only applies in the context of allegations of supervisory harassment and that the complaint did not allege supervisory harassment. The Court granted SPS's motion to amend its answer to assert the defense (Doc. No. 35), and SPS filed an amended answer doing so (Doc. No. 38). The Court does not consider the affirmative defense waived.

[10] Although SPS moves for summary judgment as to a separate discrimination clam, Ms. Vollmar clarifies in her response that she does not allege a separate sex discrimination cause of action for her suspension and Final Written Warning. Instead, she alleges that these actions were retaliatory and part of a hostile work environment. (Pl. Br. 1). Consequently, this Court will disregard SPS's motion as to a separate discrimination claim.

shifts to the defendant to advance a legitimate, non-retaliatory reason for its actions.  *Id.* at 802–03.  If the defendant advances a legitimate, non-retaliatory reason for its actions, the burden shifts back to the plaintiff to prove that the defendant's proffered reason is merely a pretext for discrimination.  *Id.* at 806–07.  The *McDonnell Douglas* framework "was never intended to be rigid, mechanized or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990).

Ms. Vollmar alleges that she suffered retaliation when she was suspended and subsequently issued a Final Written Warning in the course of SPS's investigation into her relationship with Mr. Giovianazzo.  She argues that these actions were in retaliation for her raising allegations of sexual harassment by Mr. Steiss, as well as complaints regarding the hostility of the work environment generally.

SPS argues that Ms. Vollmar has failed to put forward evidence establishing a *prima facie* case for her retaliation claim, and that even if there is sufficient evidence supporting the *prima facie* case, SPS has presented legitimate, non-retaliatory reasons for its actions, which Ms. Vollmar has been unable to rebut with any evidence to the effect that the reason was pre-textual. Because the Court finds that genuine disputes of material fact exist as Ms. Vollmar's retaliation claim, summary judgment is improper.

### 1. *Prima Facie* Case

Under the *McDonnell Douglas* framework, the plaintiff must first establish the existence of a *prima facie* case.  To establish a *prima facie* case of retaliation, a plaintiff must show that:

> (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.

*Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  SPS does not challenge that Ms. Vollmar engaged in a protected activity.  Rather, SPS contends that Ms. Vollmar did not suffer an adverse employment action and cannot show a causal connection between the protected activity and the alleged adverse employment action.

To meet the second element of the *prima facie* case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted).  SPS argues that, as a matter of law, Ms. Vollmar's suspension and the issuance of a warning letter cannot constitute adverse employment actions for purposes of Title VII because the suspension was ultimately a paid one, and, moreover, written warnings do not constitute adverse actions.[11]  To make this argument, SPS primarily makes reference to case law it cited in support of its challenge to a separate discrimination claim, which was not pleaded by Ms. Vollmar.[12]  *See* Def.'s Br. 27.  SPS's reliance on case law analyzing discrimination claims under Title VII is problematic, however, because the standard for an adverse action in retaliation claims differs, as SPS recognizes.  In retaliation claims, "if the action taken by the [defendant] would tend to dissuade a reasonable employee from engaging in future protected action, it would

---

[11] SPS also argues that because Ms. Vollmar continued to bring offensive matters to SPS's attention, this shows that a reasonable person would not be dissuaded.  The Court is not persuaded that Ms. Vollmar's persistence indicates acceptance.  SPS's position as that Ms. Vollmar continued to raise issues of alleged harassment is also somewhat inconsistent with its position that Ms. Vollmar acquiesced to the SPS workplace's climate.

[12] SPS refers to a handful of cases analyzing the *prima facie* case for discrimination in support of its contention that a suspension with pay and the written warning are not an adverse action under Title VII.  *See, e.g.*, *Lewis v. Bell Atl./Verizon*, 321 F. App'x 217, 221 (3d Cir. 2009) (holding that, under Title VII, an African American's suspension "was not an adverse employment action, as he was reinstated with back pay and the incident was expunged from his record"); *Reynolds v. Dep't of Army*, 439 F. App'x 150, 153 (3d Cir. 2011) (holding that placement in a performance improvement plan, which required the plaintiff to improve performance or face reassignment, demotion, or termination "is not an adverse employment action absent accompanying changes to pay, benefits, or employment status").

suffice to form the adverse action requirement." *Rivers v. Potter*, No. CIV.A. 05-4868 (JLL), 2007 WL 4440880, at \*9 (D.N.J. Dec. 18, 2007).

Ms. Vollmar argues that in the retaliation context, suspension with back pay constitutes an adverse employment action as a matter of law.  Indeed, in *Ellerth*, the Supreme Court specifically addressed the fact that the plaintiff received back pay for the time she was suspended and concluded that the back pay did not cure the adverse nature of the defendant's action: "[m]any reasonable employees would find a month without a paycheck to be a serious hardship" and therefore "[a] reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former.  That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay."  548 U.S. at 72–73.  Courts in this Circuit have agreed.  *See, e.g*, *Baur v. Crum*, 882 F. Supp. 2d 785, 805 (E.D. Pa. 2012), aff'd, 517 F. App'x 101 (3d Cir. 2013) (concluding that a one-day suspension may constitute an adverse action); *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 590 (W.D. Pa. 2009) (holding that a jury could determine that a paid suspension where the plaintiff was denied the opportunity to earn commissions was an adverse employment action in the retaliation context).  Likewise, there is support for Ms. Vollmar contention's that a final written warning constitutes an adverse action. *See Rivers*, 2007 WL 4440880, at \*9. ("[B]oth the temporary issuance of a letter of warning, and the later reduction of the letter to an official discussion comprise actions that would cause an employee to reconsider bringing an EEO charge.")

Here, Ms. Vollmar served a ten-day suspension following a written warning.  When the suspension was issued, it was indefinite.  Although she later received backpay, the suspension was initially without pay.  Ms. Vollmar also alleges that she lost eighteen hours of overtime work

during her ten-day suspension.  The Court concludes that a reasonable jury may determine that such actions would be considered adverse under Title VII.

To make out a *prima facie* case of retaliation, a plaintiff must also show evidence that establishes a causal link between the protected activity and the adverse action. *Moore*, 461 F.3d at 341–42. SPS argues that the only protected activity from which a retaliation claim could emanate would be the Ms. Vollmar's complaint at to Mr. Steiss, and it contends that the record establishes no connection between her complaint as to Mr. Steiss in August 2013 and her suspension and written warning because the investigation resulting in those actions had already begun when Ms. Vollmar made her complaint as to Mr. Steiss.

Ms. Vollmar argues that the record establishes a causal link between the adverse action and her complaint, based upon (1) the temporal proximity, (2) the pattern of antagonism after the protected act and (3) the record as a whole.  *See Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 530 (E.D. Pa. 2014) (noting this list is non-exclusive).  With regard to the first factor, the Court of Appeals for the Third Circuit has found a temporal proximity of two days to be unusually suggestive of causation.  *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) ("Temporal proximity, without more, may create an inference of causation if the timing is unusually suggestive," and "ordinarily, a period of less than one week is unusually suggestive.") Conversely, a temporal proximity of more than ten days required additional evidence. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir.2000). Generally, on the question of whether suggestive timing is sufficient to establish causation, "the Third Circuit has opted for a fact-based approach and has ruled differently on this issue depending, of course, on how proximate the events actually were, and the context in which the issue came before the court, including the procedural posture of the case." *Burgess-Walls v. Brown*, No. 11-275, 2011 WL

3702458, at *7 (E.D. Pa. Aug. 22, 2011) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)).

The bulk of Ms. Vollmar's emphasis is placed on the temporal link between the complaint and her suspension, which she suggests, is "unusually suggestive." Here, the record shows that Ms. Vollmar complained about Mr. Steiss's conduct, as well as other sexual harassment, as late as August 19, 2013. Seven days later, on August 26, 2013, she was suspended without pay. At the time she was suspended, she was not given a return to work date and the suspension appeared to be indefinite. While suspended, she was required to call in each day to learn if there was a status update. Eleven days after her suspension, on September 6, 2016, she received a Final Written Warning, which stated it "[wa]s the last and final step of discipline" and cautioned that "any future instances of providing false information will result in the immediate termination of your employment." Ex. P-4 to Ray Dep. The temporal proximity here falls squarely between the two days reference in *Jalil* and the ten days noted in *Farrell*. Temporal proximity need not be dispositive here, however, because additional evidence exists to supplement temporal proximity and support finding causation.

Although SPS urges that Ms. Vollmar was already being investigated when she engaged in protected activity, there is also evidence that Mr. Ray did not consider suspending Ms. Vollmar until after she engaged in protected activity. Notably, SPS's Human Resources Director, Bridgette Drelling acknowledged that "part of the reason [SPS] suspended [Ms. Vollmar] was because [SPS] wanted to give [itself] time to investigate her allegations of harassment." Pl. SOF at ¶85. The record as a whole also contains evidence that the SPS workplace was a hostile environment for Ms. Vollmar. Given that here, the Court is to consider

the record as a whole when determining causation, the temporal proximity in conjunction with other evidence on the record make summary judgment improper.

### 2.  Legitimate Reason for Action and Pretext

Under the *McDonnell Douglas* framework, once the plaintiff establishes her *prima facie case* of retaliation, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment action the plaintiff suffered.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07.  To defeat summary judgment when the employer advances a legitimate, non-discriminatory reason, the plaintiff must show pretext by pointing to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  The "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.  *Id.* at 765 (internal quotation marks and citation omitted; alteration in original).

In addition to arguing that Ms. Vollmar cannot make out her the *prima facie* case of retaliation, SPS also argues that it has provided a non-discriminatory, non-pretextual basis for the adverse employment decision—namely, that Ms. Vollmar was suspended for failing to cooperate in an investigation into her relationship with Mr. Giovinazzo, as she was required to do under the company's Code of Conduct.

Ms. Vollmar does not directly dispute the investigation, but rather argues that the justification offered by SPS is merely pretext for their discrimination and retaliation for her

harassment complaint.  Ms. Vollmar's evidence of retaliatory animus is not especially strong, but the non-retaliatory reasons offered by SPS likewise suffer inconsistencies.  Ms. Vollmar again references the temporal proximity between the alleged retaliatory conduct and her complaint of sexual harassment.  Notably, however, Ms. Vollmar's counsel recognized at oral argument that temporal proximity alone does not satisfy the pretext requirement.  Ms. Vollmar primarily relies on Ms. Drelling's testimony that looking into Ms. Vollmar's allegations of harassment was "part of the reason" SPS suspended her.  Her testimony could be viewed as an admission that Ms. Vollmar's complaint was a motivating factor in the allegedly adverse action, and could shed doubt on the testimony of other SPS decision-makers who testified otherwise.  While Ms. Drelling's testimony does not wholly contradict testimony offered by other SPS decision-makers, it shows a weakness or inconsistency in SPS's position such that a reasonable jury could conclude that SPS's proffered reasons for were pretextual and that the suspension and Final Written Warning were motivated by animus.

**IV.    Conclusion**

For the foregoing reasons, the Court will deny the motion for summary judgment filed by SPS and the motion for partial summary judgment filed by Ms. Vollmar.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge